ABDULLAH M. AL-RAYES, et al.,

        Plaintiffs,

v.                                  Case No. 3:15-cv-107-J-34JBT

ERIKA M. WILLINGHAM, individually and
as Trustee of the Erika M. Willingham Trust,

        Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant Erika M. Willingham's Motion for Summary Judgment (Doc. No. 153; Motion), filed on June 27, 2017. On July 11, 2017, Plaintiffs filed their Opposition to Defendant Erika M. Willingham's Renewed Motion for Summary Judgment (Doc. No. 157; Response). With leave of Court, see Endorsed Order (Doc. No. 162), Erika Willingham filed her Reply to Plaintiffs' Response in Opposition to Defendant's Renewed Motion for Summary Judgment (Doc. No. 163; Reply) on July 31, 2017, and Plaintiffs filed their Sur-Reply in Further Opposition to Defendant Erika M. Willingham's Renewed Motion for Summary Judgment (Doc. No. 164; Sur-Reply) on August 11, 2017. Accordingly, this matter is ripe for review.[1]

---

[1] In support of the Motion, Erika Willingham filed various depositions and documents. See Doc. Nos. 153-1—153-14. Similarly, Plaintiffs submitted the Declaration of Mario M. Kranjac (Doc. Nos. 158-59; Kranjac Decl.) together with various depositions and documents in support of the Response. See Doc. Nos. 158-1—158-43; 159-1—159-20. Because many of these exhibits are duplicates, where necessary, the Court will only cite to one copy, not both.

## I. Background[2]

This action arises from Plaintiffs' as-yet unsuccessful efforts to collect on a Consent Judgment entered against Defendant Erika Willingham's husband, Ben Willingham, in 2007.  See Third Amended Complaint and Demand for Jury Trial (Doc. No. 103; TAC) ¶ 1.  Erika Willingham is a dual citizen of Switzerland and the United States currently residing in Jacksonville, Florida.  See id. ¶ 15; Defendant Erika M. Willingham's Answer and Affirmative Defenses to Plaintiffs' Third Amended Complaint (Doc. No. 152; Answer) ¶ 3.  She has been married to Ben Willingham, who is not a party to this action, for approximately thirty-five years.  See TAC ¶ 15; Answer ¶ 3.  Plaintiff Abdullah M. Al-Rayes (Al-Rayes) is a citizen of Saudi Arabia currently residing in Switzerland.  See TAC ¶ 9.  Al-Rayes brings this action together with various corporate entities under his control (collectively, Creditors).[3]

From 1994 to 1999, Creditors purchased nine properties through Ben Willingham and several of his corporate entities.  See Kranjac Decl. ¶ 5.  In 2005, an officer of the Plaintiff corporations, Mario M. Kranjac, uncovered what he believed to be a fraudulent scheme perpetrated by Ben Willingham and his companies in connection with these transactions.  Id. ¶¶ 1, 9.  As a result, on April 20, 2006, Creditors filed a lawsuit against

---

[2]     Because this case is before the Court on Defendant Erika Willingham's Motion, the facts recited herein, and all reasonable inferences drawn therefrom, have been viewed by the Court in a light most favorable to Plaintiffs.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008); see also Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 822 (11th Cir. 1997) ("For the limited purpose of our analysis . . . at the summary judgment stage, we are bound to view the facts in the light most favorable to the plaintiffs.").

[3]     Plaintiff Enterprise Properties, Inc. is a Florida corporation with its principal place of business in New York, New York.  TAC ¶ 10.  Plaintiffs Ranger Investments, Inc., Ranger-Kenmar, Inc., Essex Investments, Inc., and Essex-Triangle, Inc. are all Georgia corporations with their principal place of business in New York, New York.  Id. ¶¶ 11-14.

Ben Willingham and others, asserting various fraud-based claims related to the purchases.  See id. ¶ 32; see also Al-Rayes v. Willingham, No. 06-cv-362-J-34JRK, ECF No. 1 (M.D. Fla. Apr. 20, 2006) (complaint).  The parties resolved this 2006 lawsuit on March 15, 2007, via the entry of a consent judgment whereby, without admitting liability, Ben Willingham agreed to pay Creditors the amount of $25,707,605.  See Kranjac Decl. ¶ 33, Ex. 13: Consent Judgment (Doc. No. 158-13; Consent Judgment).  However, since that time, Creditors have been able to collect only $39,943.81 from Ben Willingham.  See id. ¶ 156.  As a result of their stymied collection efforts, Creditors bring the instant lawsuit in which they contend that Erika Willingham has assisted her husband in orchestrating and carrying out a different fraudulent scheme, this one designed "to conceal [Ben Willingham's] assets in order to hinder, delay, or impede Plaintiffs' ability" to collect on the amount due under the Consent Judgment.  TAC ¶ 1.

On January 9, 2008, Creditors deposed Ben Willingham for the purpose of obtaining information about his assets in furtherance of their efforts to collect on the Consent Judgment.  See Kranjac Decl. ¶ 35, Ex. 14: January 9, 2008 Deposition of Ben H. Willingham, Jr. (Doc. No. 158-14; 2008 BW Dep.).  During this deposition, Ben Willingham disclosed the existence of three USAA Federal Savings Bank accounts (USAA Accounts) which he jointly owned with Erika Willingham.  See 2008 BW Dep. at 21:22-22:17.  He further testified that: (1) he did not have any accounts or assets in Switzerland, where Erika Willingham is from and where the Couple previously resided; (2) Erika Willingham possessed at least one Swiss bank account over which she had sole control; and (3) Erika Willingham made regular wire transfers from that account to the

USAA Accounts to help pay for the Couple's living expenses. <u>See</u> <u>id.</u> at 47:23-48:1; 60:21-61:16; 68:8-69:22.

Later that year, on May 29, 2008, Creditors deposed Erika Willingham. <u>See</u> Kranjac Decl. ¶ 39, Ex. 15: May 29, 2008 Deposition of Erika Willingham (Doc. No. 158-15; 2008 EW Dep.). During this deposition, Erika Willingham testified that she was unaware of any accounts aside from the USAA Accounts, and that she did not have any other bank accounts in her individual name. <u>See</u> 2008 EW Dep. at 17:24-18:1; 33:16-19. At the same time, she noted that her husband was primarily responsible for managing the Couple's finances and paying the bills, including mortgage payments. <u>See</u> <u>id.</u> at 8:6-12; 21:3-14. As part of this discussion, Creditors' counsel inquired as to whether Erika Willingham owned the Couple's then-current home (the Fair Lane Drive Property), as well as whether the mortgage on the Fair Lane Drive Property was in her name alone. <u>See</u> <u>id.</u> at 6:15-24; 7:21-8:5. She responded that, although the house was in her name alone, she could only "guess" that the mortgage was as well. <u>See</u> <u>id.</u>

On October 27, 2010, Creditors deposed Ben Willingham for the second time as part of their efforts to collect on the Consent Judgment. <u>See</u> Kranjac Decl. ¶ 47, Ex. 19: October 27, 2010 Deposition of Ben Hill Willingham (Doc. No. 158-19; 2010 BW Dep.). During this deposition, consistent with his prior testimony, Ben Willingham testified that he did not have any accounts in his name alone, and that his wife did not have any undisclosed checking or savings accounts, save for a trust account created for her by her parents. <u>See</u> 2010 BW Dep. at 15:9-17:22; 25:6-16; 26:17-21. He also testified that, although he was certain his wife was on the mortgage for the Fair Lane Drive Property,

he did not know if he countersigned it.  <u>See</u> <u>id.</u> at 48:24-49:2.  However, a review of the mortgage agreement for the Fair Lane Drive property reflects that on May 3, 1999, eight years before entry of the Consent Judgment, both Ben and Erika Willingham signed the document.  <u>See</u> Kranjac Decl. ¶ 110, Ex. 45: Mortgage Agreement (Doc. No. 158-45).

On February 17, 2011, Ben Willingham filed a Chapter 7 bankruptcy action (Bankruptcy Action) in the United States Bankruptcy Court in and for the Middle District of Florida, Jacksonville Division (Bankruptcy Court).  <u>Id.</u> ¶ 49.  In another attempt to collect on the Consent Judgment, Creditors initiated an adversary proceeding (Adversary Proceeding) in the Bankruptcy Action on May 23, 2011.  <u>Id.</u> ¶ 50.  On December 8, 2011, Creditors deposed Erika Willingham in connection with the Adversary Proceeding.  <u>Id.</u> ¶ 51, Ex. 20: December 8, 2011 Deposition of Erika Willingham (Doc. No. 158-20; 2011 EW Dep.).  During her deposition, Erika Willingham testified that she did not have any funds in Switzerland, and that the only transfers made from Switzerland to the USAA Accounts were her and her husband's Swiss-equivalent Social Security payments.  <u>See</u> 2011 EW Dep. at 18:1-20:2.  When confronted with records reflecting wire transfers to the USAA Account from an account in Switzerland, she testified that she was unaware of the account, and that she had given her husband complete control over the money she inherited from her parents.  <u>See</u> <u>id.</u> at 21:10-25:14 ("Q: Did you even know that this account existed? // A: Which account? Q: That is transferring money into USAA. // A. No." . . . "A: And he – I left everything to Ben because I trust him. // Q. So you gave him control over the account in Switzerland?  // A. Yes. Always.").  She also maintained that her husband managed the Couple's finances and that she did not actually know how many

bank accounts she had.  See id. at 22:5-26:8 ("Q: Do you have any idea how many accounts you have? // A: No.").

In conjunction with the Bankruptcy Action, on August 8, 2012, Ben Willingham submitted a breakdown of the Couple's assets and liabilities to the Bankruptcy Court.  See Kranjac Decl., Ex. 21: Summary of Schedules & Schedules (Doc. No. 158-21; Schedules).  Notably, Ben Willingham signed a declaration, under penalty of perjury, as to the accuracy of the Schedules, but the document is not signed by his wife.  See Schedules at 6.  In the Schedules, Ben Willingham represented that the Couple had no significant assets and a combined average monthly income of $4,062.  See Kranjac Decl. ¶ 55; Schedules.  However, one week later, on August 15, 2012, the Couple "submitted an application to the Naval Continuing Care Retirement Foundation, Inc. (NCCRF) for a residence at a retirement community [located in Jacksonville, Florida,] named Fleet Landing[,]" in which they represented that they owned real estate valued at $750,000, investments valued at $395,000, and had approximately $40,000 in cash, among other things. Id. ¶¶ 57-58, Ex. 22: Fleet Landing Confidential Data Application (Doc. No. 158-22; Application).[4]  Then, on October 22, 2012, without informing the Bankruptcy Court, the Couple formally "entered into a contract with NCCRF for a residence at Fleet Landing" and "agreed to pay an entrance fee of $254,962.50 for their residence[,]" as well as monthly fees in the amount of $4,611.  Id. ¶¶ 64-67, Ex. 27: Fleet Landing Residency

---

[4]      Between August and September of 2012, the Couple transferred $127,346.25 via wire from Erika Willingham's Swiss accounts to NCCRF.  See id. ¶¶ 60-62 (citations omitted).  These transfers were not disclosed to Creditors or the Bankruptcy Court.  Id. ¶ 63.

Contract (Doc. No. 158-27; Residency Contract).[5]  Both Ben and Erika Willingham signed the Application and the Residency Contract.  <u>See</u> Application at 4; Residency Contract at 17.

Meanwhile, on May 7, 2012, the trustee in the Bankruptcy Action (Bankruptcy Trustee) filed an application to employ a special attorney (Kranjac Decl., Ex. 29: Application for Authority to Employ Nina M. LeFleur as Special Attorney (Doc. No. 158-29; LeFleur Application)), stating that he was in need of "special counsel to prosecute avoidable fraudulent transfers," among other things.  <u>See</u> Kranjac Decl. ¶¶ 71-72 (citing LeFleur Application at 1).  Soon after, on May 25, 2012, the Bankruptcy Trustee filed a motion seeking turnover of Erika Willingham's Swiss accounts, which based on her 2011 deposition testimony, the Bankruptcy Trustee contended were part of Ben Willingham's bankruptcy estate given that they were actually "owned and controlled by [him]."  <u>See</u> <u>id.</u> ¶ 74, Ex. 30: Trustee's Motion for Turnover of Property of the Estate (Doc. No. 158-30; First Turnover Motion) at 2.  After conducting an evidentiary hearing, on February 15, 2013, the Bankruptcy Court issued its Findings of Fact and Conclusions of Law on the First Turnover Motion.  <u>See</u> Kranjac Decl., Ex. 31: Findings of Fact and Conclusions of Law (Doc. No. 158-31; Findings on First Turnover Motion).  In its Findings, the Bankruptcy Court determined that between December 13, 2007, and November 22, 2010, approximately 68 wire transfers were made from a Swiss bank account, titled solely in

---

[5]  After moving in to their residence at Fleet Landing in November of 2012, and until November of 2014, Ben Willingham made approximately twenty-five additional payments to NCCRF, totaling $132,686, via wire transfer from Erika Willingham's Swiss Account and the Couple's joint USAA Account.  <u>See</u> <u>id.</u> ¶¶ 68, 69, Ex. 28: Fleet Landing Bank Statements and Checks (Doc. No. 158-28).  These transfers were not disclosed to Creditors or the Bankruptcy Court.  <u>Id.</u> ¶ 70.

Erika Willingham's name, into a joint USAA checking account owned by the Couple.  See Findings on First Turnover Motion at 2.  Notably, the Bankruptcy Court observed that the Couple gave contradictory testimony with respect to these wire transfers with Ben Willingham testifying that Erika Willingham managed the accounts herself, would tell him what transfers to make, and has talked to the bank on the phone, and Erika Willingham denying all knowledge of the existence of the Swiss account or the wire transfers.  See id. at 2-5.

The Bankruptcy Court found that it was "unable to determine whether the proceeds of the Swiss Account" are property of Ben Willingham's bankruptcy estate.  See id. at 6.  However, the Bankruptcy Court did find good cause to order Erika Willingham to produce records relating to "the Swiss Account" as relevant and indispensable to the Trustee's claim.  See id. at 6-7.  Shortly thereafter, Creditors received account records from the Couple as well as directly from various Swiss banks.  See Kranjac Decl. ¶¶ 82-83.  The records revealed a large number of wire transfers of Ben Willingham's "salary, social security, and health insurance payments," into Erika Willingham's Swiss Account (the PostFinance Account) between 2002 and 2013.  See id. ¶¶ 85-87, Ex. 32: 2002-2005 PostFinance Account Statements (Doc. No. 158-32) and Ex. 33: 2006-2016 PostFinance Account Statements (Doc. No. 158-33).  The records also showed transfers into the PostFinance Account from other Swiss accounts.  See id. ¶¶ 88-89, Exs. 32-33.

On April 24, 2014, during the pendency of the Bankruptcy Action, the Couple sold the Fair Lane Drive Property.  See id. ¶ 106, Ex. 41: General Warranty Deed (Doc. No. 158-41).  The Couple received $334,295.53 in proceeds from the sale.  Id. ¶ 111, Ex. 47:

Settlement Statement (Doc. No. 159-4). However, at no time did the Couple notify Creditors or the Bankruptcy Court that they had sold the Fair Lane Drive Property or that they had made a profit on the sale. See id. ¶ 115. Later that year, between June and July of 2014, Creditors deposed Ben Willingham for a third time, this time regarding the newly-produced records of the Swiss accounts. Id. ¶ 116, Exs. 1, 43: June 18 and July 18, 2014 Deposition of Ben Hill Willingham (Doc. Nos. 158-1, 158-43; 2014 BW Dep.)). During his deposition, Ben Willingham identified numerous deposits and transfers – via wire – of his social security payments and salary, as well as health insurance payments and tax refund payments of the Couple, into Erika Willingham's PostFinance account from 2002 onward. See 2014 BW Dep. at 165:20-22, 169:5-13 (discussing social security); 169:24-170:25, 172:12-19, 184:2-5, 251:15-18 (discussing salary); 203:21-204:13 (discussing health insurance); 211:5-212:1 (discussing income tax refunds). Ben Willingham acknowledged that some of the funds in the PostFinance Account were used to pay for the Couple's personal living expenses. See, e.g., id. at 208:7-209:5, 236:11-238:9, 242:8-11, 246:23-247:4, 291:2-7. He also identified transfers in the PostFinance Account related to three investment accounts that he maintained were owned by his wife: an account at SwissQuote, an account at Bank Sarasin, and an account at Bank Leu, later named Clariden Leu. See id. at 213:22-217:25, 230:9-19.[6] He testified that the

---

[6] When Creditors deposed Erika Willingham in 2017, she recalled that she had two bank accounts in Switzerland, the PostFinance account and the account with Bank Leu. See Kranjac Decl., Ex. 17: February 23, 2017 Deposition of Erika Willingham (Doc. Nos. 158-17 and 23; 2017 EW Dep.) at 55. She testified that she never had an account at Bank Sarasin, see id. at 93-97, and could not remember if she ever had an account at SwissQuote, id. at 102-03. According to Erika Willingham, she gave her husband full signatory authority of her PostFinance and Bank Leu accounts and he handled all the banking. Id. at 115.

funds in the investment accounts came from his wife's retirement money, cashed out life insurance policies on him and his wife, and his wife's inheritance from her parents. Id. at 217:17-25.

According to Ben Willingham, his wife was generally aware that he was making these transfers, and in fact consented to him doing so. Id. at 248:1-249:1. Indeed, with respect to several transactions listed on the PostFinance bank records, Ben Willingham testified that he was unable to identify the transaction because it was initiated by his wife. See, e.g., id. at 225:23-226:24, 230:3-7, 233:20-234:17. As a result of this testimony, on August 28, 2014, the Bankruptcy Trustee filed a renewed motion for turnover of the assets contained in the Swiss accounts. See Kranjac Decl. ¶ 120, Ex. 48: Trustee's Renewed Motion for Turnover of Property of the Estate (Doc. No. 159-5). Shortly thereafter, on September 11, 2014, the Bankruptcy Court entered a consent judgment (Kranjac Decl., Ex. 49: Consent Judgment as to Dischargeability of Debt (Doc. No. 159-6)), ordering that Creditors' 2007 Consent Judgment would not be discharged under the Bankruptcy Action. See Kranjac Decl. ¶ 122.

On October 31, 2014, Erika Willingham acquired a condominium in Jacksonville, Florida (the Ortega Boulevard Condo) for approximately $120,000. See id. ¶ 123, Ex. 50: General Warranty Deed (Doc. No. 159-7) and Ex. 51: Settlement Statement (Doc. No. 159-8). Although the Ortega Boulevard Condo was purchased using funds from the Couple's jointly-owned USAA Accounts, title was placed in Erika Willingham's name alone. See id. ¶ 124 (citations omitted). Additionally, the Couple did not disclose the purchase to Creditors or the Bankruptcy Court. Id. ¶ 125. In mid-November of 2014, the

Couple moved out of Fleet Landing and into the Ortega Boulevard Condo.  See id. ¶ 126 (citation omitted).  Subsequently, on December 19, 2014, the Couple received a partial refund of their entrance fee to Fleet Landing from NCCRF in the amount of $140,436. See id. ¶ 127, Ex. 53: Check (Doc. No. 159-10; NCCRF Check).  Notably, the check was made out to Ben Willingham, and not to Erika Willingham.  See NCCRF Check.  Again, the Couple failed to disclose this transaction to Creditors or the Bankruptcy Court.  See Kranjac Decl. ¶ 130.

Based on these events, on January 20, 2015, Creditors filed their initial complaint. See Complaint and Demand for Jury Trial (Doc. No. 1; Complaint).  They subsequently amended their Complaint three times, and on November 18, 2016, Creditors filed the TAC, which is now the operative pleading in this action.  See generally TAC.  In the TAC, Creditors allege the following nine causes of action against Erika Willingham: a claim for violation of 18 U.S.C. § 1962(c), part of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act (Count I); a claim under 18 U.S.C. § 1962(d) for conspiracy to violate the RICO Act (Count II); a claim for violation of Fla. Stat. § 895, et seq., Florida's RICO Act (Count III); a claim for fraud (Count IV); a claim for fraudulent concealment (Count V); a claim for negligent misrepresentation (Count VI); a claim for civil conspiracy (Count VII); a claim for violation of Fla. Stat. § 726.105(1)(a), the Florida Uniform Fraudulent Transfer Act (FUFTA) (Count VIII); and a claim for aiding and abetting a violation of FUFTA (Count IX).  See generally id.  Creditors contend that, as a result of the Couple's actions, they "have been unable to recover almost all of the [money] that

was wrongfully taken by [Ben Willingham] and his related entities and/or collect on their [Consent Judgment]." Id. ¶ 165.

After the commencement of this action, on January 27, 2015, the Bankruptcy Trustee filed his Notice of Intention to Compromise (Kranjac Decl., Ex. 54: Trustee's Notice of Intention to Compromise (Doc. No. 159-11; Notice)) regarding his Renewed Motion for Turnover, in which the Trustee agreed to settle the claim for turnover of the funds in the Swiss accounts for $53,000. See Kranjac Decl. ¶¶ 131-32.[7] That same day, Erika Willingham created the Erika M. Willingham Trust, named herself as trustee, and executed a quitclaim deed transferring title to the Ortega Boulevard Condo to herself as trustee. See id. ¶ 137, Ex. 55: Erika M Willingham Trust (Doc. No. 159-12) and ¶ 138, Ex. 56: Quitclaim Deed (Doc. No. 159-13).[8] In the Quitclaim Deed, Erika Willingham reserved a life estate in the Ortega Boulevard Condo for herself and her husband. See Quitclaim Deed. The Couple failed to disclose this conveyance to Creditors or the Bankruptcy Court. See Kranjac Decl. ¶ 140.

On March 2, 2015, the Bankruptcy Trustee filed a Motion for Order Approving Compromise (Kranjac Decl., Ex. 57: Motion for Order Approving Compromise (Doc. No. 159-14; Compromise Motion)) with respect to the funds in the Swiss accounts, and the

---

[7]     Notably, the Notice did not provide that the Bankruptcy Trustee or the special counsel asserted any fraudulent transfer claims, nor did it state that they had settled any such claims. See generally Notice. In the Notice, the Trustee also stated that the settlement "will have no effect on or interfere with the ability of creditors to collect on any non-dischargeable judgment against the debtor and/or third parties." Id. at 2.

[8]     According to Erika Willingham, although she signed these documents, she did not review or read the documents beforehand. See 2017 EW Dep. at 208-11. When asked if she remembered creating a trust, she testified that: "I don't have a trust. I haven't created a trust." Id. at 211. When shown the trust instrument with her signature on it, she explained that she knew the document was a trust but did not really know what it was or why it was created. Id. at 212-14.

Bankruptcy Court entered an order granting the Compromise Motion the following day. See Kranjac Decl. ¶¶ 141; 143, Ex. 58: Order Approving Compromise (Doc. No. 159-15; Compromise Order). On April 13, 2015, the Bankruptcy Trustee filed his final report in the Bankruptcy Action (Kranjac Decl., Ex. 59: Trustee's Final Report (Doc. No. 159-16; Final Report)), in which he stated that each individual plaintiff would receive $6,657.30 as a creditor of Ben Willingham in full satisfaction of his interest in the Swiss accounts, for a combined total of $39,943.81. See Kranjac Decl. ¶ 145. In the Final Report, the Bankruptcy Trustee again "made no mention of any claim for fraudulent transfer." Id. ¶ 146 (citing Final Report).

In May of 2015, the Couple formed Osborn of Jacksonville, Inc. (Osborn). Id. ¶ 149, Ex. 61: Osborn of Jacksonville, Inc. Articles of Organization and Company Agreement (Doc. No. 159-18).[9] On September 11, 2015, the Bankruptcy Court closed Ben Willingham's Bankruptcy Action. Id. ¶ 148. However, between the time of Osborn's formation and the close of the Bankruptcy Action, Ben Willingham deposited $176,630 in Osborn's corporate bank account without disclosing the deposits to Creditors or the Bankruptcy Court. See id. ¶¶ 151, 152, 155 (citations omitted).

On February 23, 2017, Creditors deposed Erika Willingham in connection with the present action. See generally id. ¶ 90, Ex. 17: February 23, 2017 Deposition of Erika Willingham (Doc. No. 158-17; 2017 EW Dep.). During her deposition, Erika Willingham

---

[9] Erika Willingham is named as a member of Osborn and signed the Articles of Incorporation, however, she denies any knowledge of why it was created or its finances. See 2017 EW Dep. at 121-29. According to Ben Willingham, he created Osborn in the hopes of starting a business and generating income, either from a book he had written or from "internet marketing" pursuant to a licensing agreement he had purchased. See 2017 BW Dep. at 29:13-30:2. Ben Willingham testified that the monies he deposited in the Osborn bank account were loans from his wife. Id. at 30:6-12; 35:21-36:5; 45:11-18.

admitted to "possibly" having some Swiss bank accounts, specifically, a postal account and an account with Bank Leu, but denied any awareness as to other accounts in her name.  <u>See</u> 2017 EW Dep. at 55:2-56:11, 97:3-12, 102:23-104:7.  She also testified that she "wasn't involved with the account[s]" in that she had previously given her husband authorization to use them.  <u>See</u> 2017 EW Dep. at 55:2-56:11; 90:1-91:9.  Specifically, Erika Willingham admitted to giving her husband signatory authority over her accounts after they got married so that he could manage the Couple's finances.  <u>See</u> <u>id.</u> at 114:22-115:21.  Indeed, with respect to general business and financial matters, Erika Willingham testified that she does not "want to know the details of these things" and that she had "trusted [her husband] for the last forty years."  <u>Id.</u> at 124:11-15.

One day later, Creditors deposed Ben Willingham.  <u>See</u> <u>generally</u> Kranjac Decl. Ex. 35: February 24, 2017 Deposition of Ben H. Willingham (Doc. No. 158-35; 2017 BW Dep.).  During his deposition, Ben Willingham admitted to receiving signatory authority over Erika Willingham's Swiss accounts.  <u>See</u> <u>id.</u> at 22:4-17; 25:6-15.  He also admitted to using funds from an account created for Osborn to pay his wife's legal fees for this action, purportedly as repayment on a loan she had initially made to the company.  <u>See</u> <u>id.</u> at 30:7-31:3.  He could not, however, produce any documentation supporting his contention that these payments were actually loan repayments.  <u>See</u> <u>id.</u> at 33:8-23.  Later in the deposition, Ben Willingham explained that he viewed the money in their joint account as belonging to his wife and provided the following explanation:

> The money in the Bank Leu account, back when there was money, was hers.  It came from an insurance pension fund that was to our benefit. I had signed it over to her 20 years ago.  And when it was closed, it was hers, and went into the Bank Leu.  And then, later, the money came from her

parents' estate.  It went to her in Bank Leu. Everything that went down was hers.

See id. at 48:19-49:7.  However, Ben Willingham did concede that his Social Security payments were generally deposited into one of the Swiss accounts and later transferred to the jointly-owned USAA Accounts.  See id. at 51:16-52:22.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[10]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion

---

[10]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Campbell v. Shinseki, 546 F. App'x 874, 879 n. 3 (11th Cir. 2013).  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Id.  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

for summary judgment." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Discussion

In her Motion and Reply, Erika Willingham argues that there are no genuine issues of material fact to preclude entry of summary judgment in her favor with respect to Creditors' federal RICO and RICO conspiracy claims. <u>See</u> Motion at 23-29; Reply at 2-7. She further attacks the viability of Creditors' additional state law claims, and in doing

so, appears to question the legitimacy of the underlying Consent Judgment while also suggesting that any continued efforts to collect on it are legally unwarranted.  <u>See generally</u> Motion at 15-23.  For the reasons set forth more fully below, the Court concludes that Erika Willingham is entitled to summary judgment on Creditors' RICO claims.  Specifically, Creditors fail to present any evidence from which a reasonable juror could find the existence of a RICO enterprise.  Likewise, the record contains no evidence of a conspiracy to engage in a RICO enterprise.  Having determined that summary judgment is due to be granted as to the federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.  As such, the Court need not address the other arguments raised in the Motion.

### A.    18 U.S.C. § 1962(c)—RICO

#### 1.    Applicable Law

Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  To recover under RICO, "'a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts.'"  <u>See</u> <u>Ray v. Spirit Airlines, Inc.</u>, 836 F.3d 1340, 1348 (11th Cir. 2016) (quoting <u>Ray v. Spirit Airlines, Inc.</u>, 767 F.3d 1220, 1224 (11th Cir. 2014)).  In addition, a plaintiff must show "'(1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.'"  <u>Id.</u> (quoting <u>Williams</u>

v. Mohawk Indus., Inc., 465 F.3d 1277, 1282-83 (11th Cir. 2006) abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714-15 (11th Cir. 2014)); see also Lawrie v. Ginn Dev. Co., LLC, 656 F. App'x 464, 467 (11th Cir. 2016) (per curiam).  Significantly, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes." See Boyle v. United States, 556 U.S. 938, 944 (2009) (internal quotation omitted).  As such, although the statute was initially enacted to fight organized crime, its application is not limited to patterns of conduct "'characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses.'" See Ray, 836 F.3d at 1348 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 243 (1989)).

As stated above, to recover under RICO, a plaintiff must establish the existence of an "enterprise."  The term "enterprise" is defined in the statute to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." See 18 U.S.C. § 1961(4).  The Supreme Court has determined that the definition in § 1961(4) encompasses "two categories of associations that come within the purview of the 'enterprise' definition." See United States v. Turkette, 452 U.S. 576, 581 (1981).  The first category "encompasses organizations such as corporations and partnerships, and other 'legal entities.'" Id. at 581-82.  The second category "covers 'any union or group of individuals associated in fact although not a legal entity.'" Id.  The statute does not place any restriction on the type of association embraced by this definition, and it includes both legitimate and

illegitimate enterprises. Id. at 580-81. Indeed, RICO is designed to "both protect[] a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protect[] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001) (internal citation omitted) (citing Turkette, 452 U.S. at 591, and quoting Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994)).

Here, Creditors allege that Erika Willingham and her husband are an "association-in-fact" enterprise. See TAC ¶ 169. In Boyle v. United States, the Supreme Court addressed the contours of such an enterprise. The Boyle Court instructed that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." See Boyle, 556 U.S. at 946. The Court explained:

> The concept of "associat[ion]" requires both interpersonal relationships and a common interest. Section 1962(c) reinforces this conclusion and also shows that an "enterprise" must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had "affairs" of sufficient duration to permit an associate to "participate" in those affairs through "a pattern of racketeering activity."

See id. (internal citations omitted). Significantly, the structural features of a RICO enterprise need not include a hierarchy or a chain of command. Id. at 948. Indeed, the decisions of an enterprise "may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." Id. Moreover, "[m]embers of the group need not have fixed roles; different members may perform

different roles at different times.  The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies."  <u>Id.</u>  Thus, stated succinctly, an enterprise is simply "'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  <u>Id.</u> at 946 (quoting <u>Turkette</u>, 452 U.S. at 583); <u>see</u> <u>also</u> <u>Jackson v. Bellsouth Telecomm.</u>, 372 F.3d 1250, 1264 (11th Cir. 2004) ("A RICO enterprise exists 'where a group of persons associates, formally or informally, with the purpose of conducting illegal activity.'" (quoting <u>United States v. Hewes</u>, 729 F.2d 1302, 1311 (11th Cir. 1984))).

In addition, the Supreme Court draws a distinction between an "enterprise" and the pattern of racketeering activity in which it engages, such that "proof of one does not necessarily establish the other."  <u>See</u> <u>Turkette</u>, 452 U.S. at 583; <u>see</u> <u>also</u> <u>Boyle</u>, 556 U.S. at 947.  An association-in-fact enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  <u>Turkette</u>, 452 U.S. at 583.  In contrast, a pattern of racketeering activity is "proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise."  <u>Id.</u>  As such, the existence of an enterprise "at all times remains a separate element" which must be proved by the plaintiff.  <u>Id.</u>  Nonetheless, the evidence of these separate elements "may in particular cases coalesce," <u>id.</u>, such that one can sometimes infer the existence of an enterprise based on evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity.  <u>See</u> <u>Boyle</u>, 556 U.S. at 947; <u>see</u> <u>also</u> <u>id.</u> at 951 (approving a jury instruction that "the existence

of an association-in-fact is oftentimes more readily proven by what [it] does, rather than by abstract analysis of its structure" (internal quotation omitted)).

The Supreme Court has also interpreted the language of section 1962(c) to require "some distinctness between the RICO defendant and the RICO enterprise." See Cedric Kushner Promotions, 533 U.S. at 162 (internal quotation omitted). Specifically, the statute makes it "'unlawful for any person employed by or associated with any enterprise' to engage in racketeering activities through that enterprise." Ray, 836 F.3d at 1355 (emphasis added) (quoting 18 U.S.C. § 1962(c)). Because it does not make sense for a person to "be employed by" or "associated with" himself, the Supreme Court has interpreted this language to require the existence of two distinct entities. See Cedric Kushner Promotions, 533 U.S. at 161-62; Ray, 836 F.3d at 1355. Moreover, the enterprise itself is often either the passive instrument of the racketeering activity, or a victim of this activity, which further necessitates a distinction between the culpable person and the enterprise at issue. See United States v. Goldin Indus., Inc., 219 F.3d 1268, 1270 (11th Cir. 2000); see also Cedric Kushner Promotions, 533 U.S. at 164-65.

In accordance with these principles, to prevail on a claim under § 1962(c), a plaintiff must allege and prove the existence of: (1) a "person"; and (2) a distinct "enterprise" "that is not simply the same 'person' referred to by a different name." See Cedric Kushner Promotions, 533 U.S. at 161. Indeed, the Supreme Court has found that "liability 'depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs.'" Id. at 163 (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)). Nonetheless, this distinctness requirement does not mean

that one cannot be both the culpable person under the statute and a <u>part</u> of the enterprise. <u>See</u> <u>United States v. Goldin Indus., Inc.</u>, 219 F.3d 1271, 1275 (11th Cir. 2000). Rather, "[t]he prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." <u>Id.</u>

## 2. Analysis

In the Motion, Erika Willingham asserts, <u>inter alia</u>, that the evidence fails to demonstrate the existence of a RICO enterprise. <u>See</u> Motion at 23. In her view, the evidence shows only that she and her husband pay part of their living expenses with money obtained from her off-shore accounts which, she contends, "does not rise to the level of a RICO Act criminal 'enterprise.'" <u>See</u> <u>id.</u> at 23. Erika Willingham maintains that there are no "allegations of a broader scheme beyond the purported sole objective of hindering [Creditors] in their collection efforts." <u>See</u> <u>id.</u> at 27. According to Erika Willingham, these "allegations" are insufficient in that a RICO enterprise must be more than a group simply conspiring to commit fraud. As such, absent any evidence that she and others were "'organized in a fashion that would enable them to function as a racketeering organization for other purposes,'" Erika Willingham asserts that Creditors' RICO claim must fail. <u>Id.</u> (quoting <u>Millette v. DEK Techs., Inc.</u>, No. 08-60639-CV, 2008 WL 5054741, at *4 (S.D. Fla. Nov. 25, 2008)).

Creditors counter that, to prove the existence of a RICO enterprise, they must only show "an association of individual entities, however loose or informal, that furnishes the vehicle for the commission of two or more predicate crimes.'" <u>See</u> Response at 19

-22-

(quoting <u>Goldin Indus., Inc.</u>, 219 F.3d at 1275).  According to Creditors, "the evidence shows that [the Couple] combined their fraudulent efforts and acted as an association-in-fact enterprise . . . sharing a common purpose of concealing [Ben Willingham's] assets to defraud" them by, <u>inter</u> <u>alia</u>: (1) concealing the existence of the Swiss accounts, (2) transferring Ben Willingham's funds into the Swiss accounts and later using some of those funds to pay for the Couple's personal expenses, (3) buying and selling real property during the pendency of Ben Willingham's Bankruptcy Action without informing Creditors or the Bankruptcy Court, and (4) creating Osborn and transferring Ben Willingham's personal funds into Osborn's corporate account.  <u>See</u> Response at 19-20.  Creditors further contend that Erika Willingham's participation in the enterprise's scheme can be inferred from her "acts in affirmatively concealing [her husband's] funds and the fact that [she] benefitted from concealing [them.]" <u>Id.</u> at 21.  Creditors argue that Erika Willingham herself is distinct from the enterprise because the enterprise constitutes both Erika and Ben Willingham.  <u>Id.</u> at 21 n.14.  In addition, Creditors maintain that Erika and Ben Willingham's association furnished the vehicle for the scheme because each needed the other in order to accomplish their purposes.  <u>Id.</u>[11]

---

[11]     Notably, the extent of Erika Willingham's knowledge and awareness of the Swiss Accounts and the wire transfers, as well as her understanding with respect to the creation of the trust and Osborn, and Ben Willingham's activities in general, are disputed facts.  Indeed, Erika Willingham generally denies any knowledge of the Couple's banking activities or financial affairs, maintains that she gave her husband complete control over the banking, and on more than one occasion signed documents at his request without understanding their meaning or purpose.  Nonetheless, because the Court views the evidence in the light most favorable to Creditors at this stage in the proceedings, for purposes of the instant Motion, the Court will accept Creditors' view that Erika Willingham knew of the Swiss Accounts, was involved in the wire transfers, and otherwise acted in concert with her husband.

Upon careful consideration of the evidence and applicable law, the Court is convinced that, under the circumstances of this case, the association between Erika and Ben Willingham does not constitute a RICO enterprise. While Erika Willingham's individual actions, as well as those taken in concert with Ben Willingham, may well constitute tortious wrongs and actionable fraud, the appropriate remedy is found under the laws of the state of Florida, not by recourse to a federal civil RICO action.

The Creditors' federal RICO claims are premised on the theory that Erika and Ben Willingham are "persons" within the meaning of § 1961(3) who together constitute an "association-in-fact" enterprise. See TAC ¶¶ 168-69. Thus, under Creditors' theory, Erika and Ben Willingham were "employed by or associated with" an enterprise made up of themselves, Erika and Ben Willingham, and conducted or participated in the conduct of this enterprise's affairs through a pattern of racketeering activity, namely mail and wire fraud. Id. ¶¶ 173-75. Relying on Boyle, Creditors contend that the relationship between Erika and Ben Willingham is sufficient to establish an enterprise because they acted together for the common purpose of concealing their assets from Creditors. The Court disagrees.

In Boyle, the petitioner, Edmond Boyle, was charged with engaging in a RICO enterprise based on evidence that he was involved with a loosely and informally organized group of individuals, who regularly came together to plan and execute a series of bank thefts, in four states, over a period spanning nearly a decade. See Boyle, 556 U.S. at 941. The group did not appear to have a leader or hierarchy, or any long-term master plan or agreement. Id. Nonetheless, the jury convicted Boyle on a RICO violation.

Id. at 943.  On appeal, Boyle challenged the adequacy of the trial court's jury instruction on the existence of an enterprise.  The Court instructed that, to establish the existence of an enterprise, the government had to prove that "there was 'an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives' and that 'the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose.'"  Id. at 951.  Boyle argued that the government should have been required to prove, among other things, an ongoing organization with an ascertainable structure distinct from the pattern of racketeering activity.  Id. at 943.  The Supreme Court rejected Boyle's challenge to this instruction, finding that although an enterprise must have "structure," see id. at 945-46, the trial court's instruction was "correct and adequate."  See id. at 951.  Under the facts of that case, evidence that a group of disparate individuals regularly came together to plan and execute bank thefts, over the span of several years, supported the inference that some form of organization existed.  Despite the lack of any formal agreement, structure or hierarchy, one could reasonably conclude, as the jury did, that an organized, ongoing, enterprise existed, separate and apart from the individuals themselves, which operated to bring these individuals together for nearly a decade to conduct racketeering activities.

In contrast, the fact that Erika and Ben Willingham have associated with each other for decades is to be expected as they are a married couple.  Thus, in this case, the long-term association of these two individuals does not suggest the existence of an "organization."  Nonetheless, Creditors contend that Erika and Ben Willingham formed an "association-in-fact" enterprise based on their combined efforts and "common purpose of

concealing BW's assets" from Creditors.  <u>See</u> Response at 19.  In Creditors' view, this relationship and common purpose satisfy the "structural features" required by <u>Boyle</u>.  <u>Id.</u> at 18-21.  However, Creditors' position misapprehends the nature of the relationship required by the Supreme Court's precedent.  The Supreme Court stated in <u>Turkette</u>, and reaffirmed in <u>Boyle</u>, that an association-in-fact enterprise is "a group of persons <u>associated together for a common purpose</u> of engaging in a course of conduct."  <u>See</u> <u>Turkette</u>, 452 U.S. at 583 (emphasis added); <u>Boyle</u>, 556 U.S. at 946.  Likewise, the Eleventh Circuit instructs that "[a] RICO enterprise exists 'where a group of persons associates, formally or informally, <u>with the purpose of conducting illegal activity</u>.'"  <u>See</u> <u>Jackson</u>, 372 F.3d at 1264 (emphasis added) (quoting <u>Hewes</u>, 729 F.2d at 1311).  While Erika and Ben Willingham are associated in marriage, and in the course of that marriage engaged in acts which may constitute mail or wire fraud, there is no evidence to suggest that they associated together <u>for that purpose</u>.  As such, Erika and Ben Willingham's marital relationship itself does not constitute the type of "association" which would be indicative of a RICO enterprise.  Notably, Creditors offer no evidence of a partnership between Erika and Ben Willingham that is distinct from the partnership inherent in any marriage.[12]  <u>See</u> <u>Paradise Nw. Inc. v. Randhawa</u>, No. 2:09-cv-02027-MCE-KJN, 2011

---

[12]     The Court is not suggesting that a married couple can never form a RICO enterprise.  One can conceive of a factual scenario where a couple decided to get married for the purpose of engaging in racketeering activity, or where a couple, who happened to be married, also associated together to engage in racketeering activity.  Those are not the facts of this case.  <u>Cf.</u> <u>Absolute Activist Value Master Fund Ltd.</u> <u>v. Devine</u>, 2:15-cv-328-FtM-29DNF, 2015 WL 12838168, at *19 (M.D. Fla. July 1, 2015) (finding that a husband and wife's elaborate, worldwide, multi-faceted money laundering scheme, involving numerous other actors who facilitated the scheme, constituted a RICO enterprise for purposes of resolving an ex parte motion for temporary restraining order); <u>Edvisors Network</u>, 2014 WL 3853457, at *4 (finding husband and wife as persons were distinct from their business, the enterprise).

WL 1459206, at *2 (E.D. Ca. Apr. 15, 2011) ("Because a marital relationship does not involve a common purpose of engaging in a particular course of conduct, Plaintiff has not established a RICO enterprise."); Edvisors Network, Inc. v. Husser, No. 14-062-JJB-RLB, 2014 WL 3853457, at *3 (M.D. La. Aug. 5, 2014) (rejecting argument that defendants' marriage was an enterprise); see also Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc., No. 2:09cv192-MHT, 2011 WL 2893629, at *4 (M.D. Ala. July 19, 2011) ("[I]t is difficult to conceive of these five individuals as a distinct entity, because they are associated only by virtue of their positions at the . . . corporations. What appears to bring them together is not their common purpose to commit fraud, but their common employment by [corporation] and its subsidiaries."); but see Am. Manuf. Mutual Ins. Co. v. Townson, 912 F. Supp. 291, 295-96 (E.D. Tenn. 1995) (finding that a marriage can be an "enterprise" under RICO).[13]

Nonetheless, Creditors set out a list of actions the Couple has taken to avoid collection of the Consent Judgment as evidence that the Couple is operating an "enterprise." See Response at 19-20. However, this pattern of activities also fails to support the existence of a distinct "enterprise." Under Creditors' version of the facts, Ben Willingham used his wife's financial accounts in Switzerland to deposit his income. The Couple would transfer these funds to their joint USAA account in the United States to pay their living expenses or, on occasion, purchase a residence. The Couple held the title of their jointly-purchased residence in Erika Willingham's name only, and when they

---

[13]   This Court agrees with the assessment in Paradise Northwest that the analysis in Townson is not persuasive. See Paradise Nw., 2011 WL 1459206, at *2 n.4.

subsequently moved into a condominium, they put the title to their new residence in the name of Erika Willingham, and later, her trust. When Creditors attempted to collect on their Judgment, and throughout Ben Willingham's bankruptcy proceedings, both Erika and Ben Willingham misrepresented their financial circumstances, and failed to disclose fully their assets and income. Most recently, Ben Willingham set up a corporation, of which he and his wife were the sole members, and used the corporation's bank account to deposit personal funds and pay personal expenses. While the term "association-in-fact" does encompass a broad range of informal organizations, the existence of an enterprise with some discernable structure is still required. See Boyle, 556 U.S. at 945-47. It would stretch the term beyond all meaning to find that the above actions demonstrate the existence and use of an "enterprise" as a "vehicle" to commit fraud, much less the operation or management of the affairs of an "enterprise."[14] See Cedric Kushner Promotions, 533 U.S. at 164-65 (explaining that one purpose of RICO is to protect the public "from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'") (quoting Nat'l Org. for Women, Inc., 510 U.S. at 259)); Reves, 507 U.S. at 182 (interpreting § 1962(c) to require participation in the "operation or management of the enterprise itself").

Rather, the evidence before the Court shows that Ben Willingham managed his personal affairs, possibly with his wife's knowledge and participation, in a manner

---

[14]   Significantly, the actions at issue in this lawsuit are those of Erika and Ben Willingham in hiding Ben Willingham's assets. The RICO claim does not encompass the actions of Ben Willingham's business entities or the prior alleged fraud which gave rise to the Consent Judgment. See Plaintiffs' RICO Case Statement (Doc. No. 14) at 14-15. Although Ben Willingham did incorporate Osborn, allegedly as part of his concealment efforts, Creditors do not allege that Osborn is the RICO enterprise, or even a part of the enterprise, at issue here.

designed to hide his income and assets from Creditors.  Those are the actions of Erika and Ben Willingham, husband and wife, conducting the personal affairs of Erika and Ben Willingham, not the affairs of a separate "enterprise."  See Cedric Kushner Promotions, 533 U.S. at 163 ("[L]iability 'depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs."); see also Gross v. Waywell, 628 F. Supp. 2d 475, 498 (S.D.N.Y. 2009) ("[D]efendants who allegedly constitute an illegal enterprise and engage in predicate offenses in furtherance of the defendants' own affairs or purposes, as opposed to the affairs or purposes of their common 'enterprise,' would fail to satisfy the requirements of RICO.").  As such, the Court determines that, even when viewing the facts in the light most favorable to Creditors, no reasonable juror could conclude that Erika and Ben Willingham formed an "organization with some sort of framework, formal or informal," for the purpose of engaging in racketeering activity.  Absent the existence of an enterprise, Erika Willingham's Motion is due to be granted as to Creditors' substantive RICO claim.

### B.    18 U.S.C. § 1962(d)

The Court turns next to Creditors' RICO conspiracy claim set forth in Count Two of the TAC.  "Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c)."  See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 (11th Cir. 2010).  While "a [person] may be liable for RICO conspiracy even if [she] is not liable for the substantive RICO offense," to support a claim for RICO conspiracy a plaintiff must establish "an illegal agreement to violate a substantive provision of the RICO statute."  See Jackson, 372 F.3d at 1269.

Significantly, just as with the substantive RICO claim, the RICO conspiracy claim also requires the existence of an "enterprise." See Almanza v. United Airlines, Inc., 851 F.3d 1060, 1067 (11th Cir. 2017) ("Each of these subsections [§ 1962(a), (c) and (d),] requires Plaintiffs to have alleged the existence of an 'enterprise'—subsections (a) and (c) require this explicitly, and subsection (d) requires it implicitly by virtue of incorporating the elements of subsection (c)." (internal citation omitted)).

Here, Creditors allege that Erika and Ben Willingham formed a conspiracy the purpose of which was to "conduct[] and participat[e] in the conduct of the affairs of the association-in-fact enterprise created to defraud Plaintiffs by concealing Ben Willingham's assets from Plaintiffs . . . ." See TAC ¶ 187. As such, Creditors allege that Erika Willingham participated in a conspiracy to engage in conduct which the Court has found does not constitute a violation of § 1962(c). Thus, while Erika Willingham may have conspired with her husband to commit fraud, Creditors have not shown that Erika Willingham agreed to engage in the ongoing conduct of an enterprise through a pattern of racketeering activity. See Jackson, 372 F.3d at 1269; G&G TIC, LLC v. Ala. Controls, Inc., 324 F. App'x 795, 798 (11th Cir. 2009). Accordingly, Erika Willingham is entitled to summary judgment in her favor as to Creditors' RICO conspiracy claim as well.

The Court's determination that Creditors cannot pursue a federal RICO claim against Erika Willingham does not mean that they are without recourse. Creditors have asserted a number of state common law and statutory claims against her. Litigation of those claims is the proper vehicle for Creditors to seek redress. Thus, the Court turns

next to the question of whether to continue to exercise supplemental jurisdiction of those state law claims or dismiss them to allow Creditors to pursue those claims in state court.

### C.    State Law Claims

In Counts Three – Nine of the TAC, Creditors seek relief from Erika Willingham based on various state law theories.  "The decision to exercise supplemental jurisdiction over pend[e]nt state claims rests within the discretion of the district court."  <u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1088-89 (11th Cir. 2004).  Pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise jurisdiction over a state claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Notably, "[a]ny one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims."  <u>Parker v. Scrap Metal Processors, Inc.</u>, 468 F.3d 733, 743 (11th Cir. 2006).  However, upon determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district court] should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience in deciding whether or not to exercise that jurisdiction."  <u>Palmer v. Hosp. Auth. of Randolph Cnty.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994).  Upon due consideration, the Court finds that judicial economy and convenience would not be served

by retaining jurisdiction over Creditors' state law claims. Thus, the Court declines to exercise its supplemental jurisdiction over these claims.

For the reasons set forth above, the Court has determined that Erika Willingham's Motion for Summary Judgment is due to be granted in regards to each of the federal claims in Counts One and Two of the TAC, over which the Court has original jurisdiction. What remains are uniquely state law claims that are best addressed by the state courts. Indeed, the Eleventh Circuit has indicated that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Hicks v. Moore, 422 F.3d 1246, 1254-55, 1255 n.8 (11th Cir. 2005) (after granting summary judgment on all federal claims in favor of the defendant, the Eleventh Circuit noted the district court's discretion in whether to remand the plaintiff's supplemental state law claims); Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (affirming and attaching as appendix district court decision which stated: "If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim

should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185-86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). However, "[w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350 (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)) (footnote omitted); Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney, 370 F.3d at 1089 (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)).

Notably, the Supreme Court's directive in <u>Cohill</u> concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be applied in all but extraordinary cases." <u>Carr v. Tatangelo</u>, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing <u>Cohill</u>, 484 U.S. at 350 n.7).  Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial. <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1353 (11th Cir. 1997).  Here, the Court has determined that summary judgment in favor of Erika Willingham is proper with regard to Creditors' federal claims.  Because all federal claims have been dismissed prior to trial, the Court, in its exercise of discretion under § 1367(c), declines to retain jurisdiction over Creditors' remaining state law claims.  <u>See</u> <u>Hicks</u>, 422 F.3d at 1255 n.8. Accordingly, Counts Three through Nine of the TAC are due to be dismissed without prejudice to refiling in the appropriate state court.[15]  In accordance with the foregoing, it is

**ORDERED**:

---

[15]     The Court notes that Creditors will suffer no harm from the Court's decision to decline supplemental jurisdiction because federal law provides for the tolling of the state limitations period while a state claim is pending in federal court and for thirty days thereafter.  Specifically, 28 U.S.C. § 1367(d) provides that:

> [t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

As such, the state limitations period has been held in abeyance during the pendency of these proceedings.  <u>See</u> <u>Artis v. District of Columbia</u>, 138 S. Ct. 594, 598 (2018) (holding that "§ 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, <u>i.e.</u>, to stop the clock").

1. Defendant Erika M. Willingham's Motion for Summary Judgment (Doc. No. 153) is **GRANTED** as to Counts One and Two of the Third Amended Complaint.

2. Counts Three through Nine are **DISMISSED**, **without prejudice** to refiling in the appropriate state court.

3. The Clerk of the Court is **directed** to enter judgment in favor of Defendant Erika Willingham and against Plaintiffs Abdullah M. Al-Rayes, Enterprise Properties, Inc., Ranger Investments, Inc., Ranger-Kenmar, Inc., Essex Investments, Inc., and Essex-Triangle, Inc. on Counts One and Two of the Third Amended Complaint.

4. The Clerk of the Court is further **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on February 16, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc24/lc11

Copies to:

Counsel of Record